# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

KRISTEN WILSON,[1] Personal
Representative of the Estate
of Jayson Matthew Withers, and
KRISTEN WILSON,

       Plaintiffs,

v.

CHARLES FRATES,

       Defendant.

3:16-cv-01690-BR

OPINION AND ORDER

**MICHELLE R. BURROWS**
Michelle R. Burrows, PC
420 S.W. Washington St.
Suite 300
Portland, OR 97140
(503) 241-1955

**JENNIFER L. COUGHLIN**
Brothers Hawn and Coughlin
974 N.W. Riverside Blvd
Bend, OR 97703
(541) 382-5885

      Attorneys for Plaintiffs

**ELLEN F. ROSENBLUM**
Attorney General
**ROBERT E. SULLIVAN**
Senior Assistant Attorney General
**ANDREW D. HALLMAN**

---

[1] Although Kristen "Withers" appeared in the original Complaint as a plaintiff individually and as the Personal Representative of the Estate of Jayson Matthew Withers, Kristen Withers's name was changed to Kristen "Wilson" in the caption of the First Amended Complaint. The Court, therefore, will refer to Kristen Withers as "Wilson" throughout this Opinion and Order.

Assistant Attorney General
Oregon Department of Justice
1162 Court Street NE
Salem, OR 97301
(503) 947-4700

    Attorneys for Defendant

**BROWN, Judge.**

This case come before the Court on the Motion (#47) for Summary Judgment and Motion (#67) to Strike Portions of the Declaration of Jeremy Bauer filed by Defendant Charles Frates and the Motion (#57) Striking Testimony Offered in Support of Defendant's Motion for Summary Judgment filed by Plaintiff Kristen Wilson as Personal Representative of the Estate of Jayson Withers and in her individual capacity. The Court heard oral argument and took these motions under advisement on January 11, 2018.

For the reasons that follow, the Court **GRANTS in part** Defendant's Motion for Summary Judgment as to Plaintiffs' federal claims and **DENIES** the Motion as to Plaintiffs' state-law claims. The Court also **DENIES as moot** Defendant's Motion to Strike and **DENIES as moot** Plaintiffs' Motion to Strike.

## BACKGROUND

The following facts are taken from the Joint Statement of Agreed Facts (#41) and the materials the parties submitted in support of their Motions. Accordingly, these facts are undisputed unless otherwise noted.

Jayson Withers was an inmate at Eastern Oregon Correctional

Institution (EOCI) in Pendleton, Oregon, from 2010 until August 29, 2014, when he died after Defendant Frates, a corrections officer at EOCI, shot him.

EOCI houses approximately 1,600 male inmates. The EOCI facility is divided into East and West sides, and each side has a recreation yard referred to as the "East Yard" and "West Yard" respectively.

Whenever inmates are in either of the yards, there are corrections officers on the ground among the inmates who do not carry firearms but do carry pepper spray. These officers also carry radios that are set to a designated channel for their EOCI area.

There is one guard tower for the West Yard where this incident occurred. A corrections officer is assigned to the tower whenever inmates are in the West Yard. The tower officer supervises the yard from inside a small booth on the tower or from an adjacent platform. The tower officer carries a radio and is armed with a Ruger Mini-14, which is a .223 caliber semi-automatic rifle with a four-power scope. The tower officer also has access to a footpedal-operated public-address system to communicate with inmates in the yard.

Each yard is equipped with several video cameras, but those cameras do not canvas the entire yard. The cameras are remotely controlled by the EOCI Control Center. If an officer reports by radio that an incident is occurring, the Control Center can then pan, zoom, and record the incident at the appropriate location.

On the morning of August 29, 2014, Defendant was assigned duty in the West Yard Tower, and, accordingly, he went to the EOCI Armory, logged in, obtained the firearms required for his assigned tower duties, and proceeded to the West Yard Tower.

Before inmates were released into the West Yard for recreation that morning, Defendant was at his assigned station in the West Yard Tower and Corrections Officers Steven Surber, Chester Kropornicki, and Dennis Bliss were on the ground in the West Yard. After these four officers were in their assigned places, inmates were allowed to enter the West Yard, which opened at approximately 8:30 a.m. Approximately 189 inmates entered the yard, including Withers, Cameron Hayes, and Eric Sexton.

Shortly after entering the yard Withers and Hayes had their photo taken with a few other inmates, and Defendant saw some of that activity from his position in the tower. After their photos were taken, Withers and Hayes approached Sexton and requested Sexton to take a walk with them around the West Yard track.

At some point Withers and Hayes engaged in an altercation with Sexton near the backstop at the far end of the West Yard, but Defendant did not observe Withers, Hayes, or Sexton after the time Withers and Hayes had their photos taken until the altercation was already underway.

When Defendant saw the altercation from inside the tower, he stepped out of the tower with his rifle, used the rifle scope to observe the altercation, lowered his rifle, and then chambered a round. Defendant also heard someone call out "stop fighting."

In the meantime, Officers Surber, Bliss, and Kropornicki also saw the altercation, and all three officers proceeded toward the three inmates. In particular, Officer Surber ran toward the three inmates and yelled at them to stop.

After chambering a round, Defendant aimed the rifle at Withers's center of mass, fired a shot, and struck Withers.

Defendant did not fire a warning shot, blow a whistle, or use the foot-pedal operated public-address system before shooting Withers. At the time Defendant fired the shot (approximately 8:45 a.m.) the altercation had being going on for less than a minute. Before Defendant fired the shot one of the yard cameras was panned to the location of the altercation, but the placement of the camera put it directly into the sun, and the video taken immediately before the shot was unusable.

The shot Defendant fired entered through Withers's neck at the approximate level of bifurcation of the carotid; transected his jugular vein on the left; struck his larynx, epiglottis, vocal chords, and strap muscles; exited his neck and immediately reentered his clavicle; and finally exited under his right arm. Withers died on the way to the hospital due to excessive blood loss.

Sexton was able to walk off the yard under his own power, and at 9:50 a.m. Sexton was transported to St. Anthony's Hospital in Pendleton, Oregon. He was diagnosed with a left orbital fracture, facial swelling, and a headache. Sexton did not show any signs of intracranial or spinal trauma after further testing.

Sexton was discharged at 12:40 p.m. and did not require further hospitalization for his injuries. All follow-up treatment occurred in Oregon Department of Corrections (ODOC) facilities.

Tower officers are authorized to use lethal force consistent with ODOC's rules and are required to comply with the following provisions:

> Oregon Administrative Rule (OAR) 291-013-0185(7) (general provisions): "The use of force must be objectively reasonable under all the circumstances known to the employees at the time. The use of force may range from verbal commands to the use of lethal force. If the force other than lethal force reasonably appears to be sufficient to achieve the correctional objective, lethal force shall not be used."

> OAR 291-013-0215(2)(lethal force): "Lethal force may be used [in a Medium Facility] when and to the extent that an employee reasonably believes it necessary: (a) To prevent imminent serious bodily injury or death to one's self or another person; . . . (c) To prevent or stop a riot or other group disturbance by inmates where there is reason to believe an inmate poses a threat of escape or imminent serious bodily injury or death to another person."

> OAR 291-013-0215(1)(lethal force): "Employees shall consider every reasonable means of control before resorting to the use of lethal force."

> OAR 291-013-0215(4)(lethal force): "Prior to resorting to the use of lethal force against an inmate or other person, if feasible, the employee shall give a verbal warning from the imminent use of lethal force."

> OAR 291-013-0215(7)(lethal force): "Firearms will not be used if innocent people are in the line of fire."

Defendant was trained in and familiar with these rules, he maintained his annual firearms proficiency in accordance with ODOC rules, and he was qualified on the Ruger .223 rifle with and without a scope. After the incident, ODOC reviewed Defendant's conduct and determined the force used was in compliance with

ODOC's use-of-force policy.  A state-court Grand Jury also determined Defendant's use of force was justified.

The parties agree Defendant was acting under color of law and within the course and scope of his employment at all times relevant to this incident.

## STANDARDS

### I.  Summary Judgment

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Washington Mut. Ins. v. United States*, 636 F.3d 1207, 1216 (9th Cir. 2011).  *See also* Fed. R. Civ. P. 56(a).  The moving party must show the absence of a dispute as to a material fact. *Rivera v. Philip Morris, Inc.*, 395 F.3d 1142, 1146 (9th Cir. 2005).  In response to a properly supported motion for summary judgment, the nonmoving party must go beyond the pleadings and show there is a genuine dispute as to a material fact for trial.  *Id*.  "This burden is not a light one . . . .  The non-moving party must do more than show there is some 'metaphysical doubt' as to the material facts at issue." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010) (citation omitted).

A dispute as to a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d

1054, 1061 (9th Cir. 2002)(quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  The court must draw all reasonable inferences in favor of the nonmoving party.  *Sluimer v. Verity, Inc.*, 606 F.3d 584, 587 (9th Cir. 2010).  "Summary judgment cannot be granted where contrary inferences may be drawn from the evidence as to material issues."  *Easter v. Am. W. Fin.*, 381 F.3d 948, 957 (9th Cir. 2004)(citation omitted).  A "mere disagreement or bald assertion" that a genuine dispute as to a material fact exists "will not preclude the grant of summary judgment."  *Deering v. Lassen Cmty. Coll. Dist.*, No. 2:07-CV-1521-JAM-DAD, 2011 WL 202797, at *2 (E.D. Cal., Jan. 20, 2011) (citing *Harper v. Wallingford*, 877 F.2d 728, 731 (9th Cir. 1989)).  When the nonmoving party's claims are factually implausible, that party must "come forward with more persuasive evidence than otherwise would be necessary."  *LVRC Holdings LLC v. Brekka*, 581 F.3d 1127, 1137 (9th Cir. 2009)(citation omitted).

The substantive law governing a claim or a defense determines whether a fact is material.  *Miller v. Glenn Miller Prod., Inc.*, 454 F.3d 975, 987 (9th Cir. 2006).  If the resolution of a factual dispute would not affect the outcome of the claim, the court may grant summary judgment.  *Id*.

**II.  Section 1983**

Section 1983 provides a remedy for the violation of constitutional rights by any person acting under color of state

law.  42 U.S.C. § 1983.  Nevertheless, "[t]he doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)(internal quotation marks omitted).

Qualified immunity is an immunity from being required to defend a § 1983 action.  *Morales v. Fry,* 873 F.3d 817, 822 (9th Cir. 2017)(citing *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)). The court follows a two-step test to evaluate whether qualified immunity precludes such an action "under which summary judgment is improper if, resolving all dispute of fact and credibility in favor of the party asserting the injury, (1) the facts adduced show that the officer's conduct violated a constitutional right, and (2) that right was 'clearly established' at the time of the violation." *Kirkpatrick v. Cty. of Washoe*, 843 F.3d 784, 788 (9th Cir. 2016)(*en banc*).  *See also Demaree v. Pederson*, No. 14-16207, 2018 WL 505254, at *6 (9th Cir., Jan. 22, 2018).


## DISCUSSION

Wilson, individually and as Personal Representative of the Estate of Jayson Withers, her son, brings claims pursuant to 42 U.S.C. § 1983 for Defendant's alleged violation of Jayson Withers's Eighth Amendment rights and Wilson's own Fourteenth Amendment rights.  In addition, the Estate alleges state-law claims for battery and wrongful death.

## I.   Defendant's Motion for Summary Judgment

Defendant contends the Court should grant his summary-judgment motion on the ground that he is entitled to qualified immunity from the § 1983 claims.

Wilson contends Defendant is not entitled to qualified immunity and that there are genuine disputes of material fact that preclude summary judgment.

### A.   Standard

Qualified immunity shields officials from civil liability when their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).  Although the law "do[es] not require a case directly on point" for a right to be clearly established, "existing precedent must have placed the statutory or constitutional question beyond debate." *White v. Pauly*, 137 S. Ct. 548, 551 (2017).  In other words, qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015).

To resolve questions of qualified immunity "courts engage in a two-pronged inquiry." *Tolan v. Cotton*, 134 S. Ct. 1861, 1865 (2014).  "The first asks whether the facts, taken in the light most favorable to the party asserting the injury, . . . show the officer's conduct violated a federal right." *Id.*  "The second prong of the qualified immunity analysis asks whether the right in question was clearly established at the time of the

violation." *Id.* at 1866. Courts have the discretion to determine the order in which to address these two prongs. *Pearson v. Callahan*, 555 U.S. 233, 236 (2009).

Governmental actors are "shielded from liability for civil damages if their actions did not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Tolan,* 134 S. Ct. at 1866. "[T]he salient question . . . is whether the state of the law" at the time of an incident provided "fair warning" to the defendants "that their alleged [conduct] was unconstitutional." *Id.*

A noted, qualified immunity protects a defendant from a lawsuit rather than providing a mere defense to liability. *Morales,* 873 F.3d at 822.

**B.  The Estate's Eighth Amendment Claim**

Defendant contends he is entitled to qualified immunity as to the Estate's Eighth Amendment excessive-force claim on the ground that a requisite element of that claim is that Defendant used force against Withers maliciously or sadistically for the purpose of causing harm or that he harbored any malice toward Withers, but there is not any evidence to support that element. In any event, Defendant asserts any reasonable officer in his position would have believed the force used was a good-faith effort to restore discipline, and, therefore, he is entitled to qualified immunity from Plaintiffs' § 1983 claim.

Wilson, at the Personal Representative of the Estate, however, contends there are numerous genuine disputes of material

fact to be resolved regarding Defendant's use of force that
preclude the application of qualified immunity, including
discrepancies in Defendant's testimony about the incident.

### 1. The Law – Excessive Force Under the Eighth Amendment

"When prison officials use excessive force against
prisoners, they violate the inmates' Eighth Amendment right to be
free from cruel and unusual punishment." *Clement v. Gomez,* 298
F.3d 898, 903 (9th Cir. 2002). The "unnecessary and wanton
infliction of pain . . . constitutes cruel and unusual
punishment." *Whitley v. Albers*, 475 U.S. 312, 319 (1986). To
establish a claim for excessive force based on a prison
official's use of force during a prison disturbance, the
plaintiff must show the officer applied the force maliciously and
sadistically to cause harm rather than in a good-faith effort to
maintain or to restore discipline. *Hudson v. McMillian*, 503 U.S.
1, 6 (1992). *See also Alexander v. Perez*, 124 F. App'x 525, 526
(9th Cir. 2005)(it is not the degree of injury suffered, but
whether the degree of force was applied "maliciously and
sadistically for the purpose of causing harm."). The standard
has objective and subjective elements. Objectively, the alleged
wrongdoing must be "harmful enough to establish a constitutional
violation." *Hudson,* 530 U.S. at 8. Subjectively, prison
officials must act "with a sufficiently culpable state of mind."
*Id.*

When force is used to keep order in the face of "a riot
or a lesser disruption, corrections officers must balance the

need to 'maintain or restore discipline' through force against the risk of injury to the inmates." *Id*. at 6. The use of force that "could plausibly have been thought necessary" will not subject a corrections officer to liability for an Eighth Amendment violation. *Whitley*, 475 U.S. at 321. *See also Marquez v. Gutierrez*, 322 F.3d 689, 692 (9th Cir. 2003). When deciding "whether a particular use of force was wanton, the courts consider the objective need for force, the relationship between any such need and the amount of force actually used, the threat reasonably perceived by the correctional officer, whether the officer took efforts to temper the severity of his response, and the extent of the inmate's injury." *Marquez v. Gutierrez*, 322 F.3d at 692 (citing *Whitley*, 475 U.S. at 321). *See also Hudson,* 503 U.S. at 6. Prison officials are allowed a "wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Id.*

The standard set forth in *Whitley* and *Hudson* requires a showing of "a much higher standard of fault than deliberate indifference." *County of Sacramento v. Lewis*, 523 U.S. 833, 852 (1998). *See also Porter v. Osborn*, 546 F.3d 1131, 1138 (9th Cir. 2008). "[L]iability should turn on 'whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm.'" *Lewis,* 523 U.S. at 853 (quoting *Whitley*, 475 U.S. at 320-21). Nevertheless, unless the evidence, viewed in the light

most favorable to the plaintiff, will support a reliable inference of wantonness in the infliction of pain, the case should not go to the jury. *Whitley*, 475 U.S. at 322.

## 2. Analysis

The Ninth Circuit's decision in *Marquez v. Gutierrez*, 322 F.3d 689 (9th Cir. 2003), provides a helpful foundation to analyze the pending Motion. In *Marquez* the plaintiff was a bystander during an assault on another inmate when he was shot by a corrections officer stationed in a guard tower located some 360 feet from the disturbance. The plaintiff was seriously injured and alleged the corrections officer violated the plaintiff's Eighth Amendment right to be protected from the use of excessive force. The plaintiff contended the defendant could not have reasonably believed his decision to shoot the plaintiff was lawful when there was a factual dispute as to the plaintiff's involvement in the incident. The defendant, however, asserted he relied on the prison's use-of-force policy, which allowed use of force if bodily injury was occurring. Thus, the defendant contended the disputed facts about who was actually kicking the other inmate was immaterial. The Ninth Circuit noted even if there was a constitutional violation of the plaintiff's rights, the defendant would still be entitled to qualified immunity "if a reasonable officer could have believed his conduct was lawful." 322 F.3d at 692. The court emphasized qualified immunity is a separate inquiry from whether prison officials acted unconstitutionally, and a claim of qualified immunity is not

defeated even if there is a triable issue of fact as to whether the defendant's decision to shoot the plaintiff was malicious. Thus, the Ninth Circuit found the officer could be entitled to qualified immunity even if he was mistaken in his perception of what was happening.

> A reasonable officer standing where [the defendant] was standing . . . could perceive that both [the plaintiff] and another inmate were kicking [the victim] and threatening [the victim] with serious injury or death, and that [the victim] was not capable of protecting himself, even if no kick was actually administered by [the plaintiff]. The scenario may look different when gauged against the "20/20 vision of hindsight," but we must look at the situation as a reasonable officer in [the defendant's] position could have perceived it. [citations omitted.] In that light, we believe that a reasonable officer could believe that shooting one inmate in the leg to stop an assault that could have seriously injured or killed another inmate was a good faith effort to restore order, and thus lawful.

322 F.3d at 693.

In *Jeffers v. Gomez* the Ninth Circuit also stated:

> Where a prison security measure is undertaken ostensibly for the protection of prison officials and the inmate population, force is deemed legitimate as long as it applied in a good faith effort to maintain or restore discipline and not maliciously and sadistically for the very purpose of causing harm.

267 F.3d 895, 910 (9th Cir. 2001)(citing *Whitley v. Albers*, 475 U.S. at 321).

Accordingly, Defendant's mental state is central to the application of qualified immunity in the context of an Eighth Amendment violation because it "is an element of the alleged constitutional violation." *Jeffers*, 267 F.3d at 911. Thus, to

overcome qualified immunity, Wilson "must put forward specific, nonconclusory factual allegations that establish improper motive in causing cognizable injury." *Id.* Defendant, however, would still be entitled to qualified immunity if a reasonable officer in Defendant's position would have thought the use of force was a good-faith effort to restore discipline. *Id.* at 692–93.

As noted, it is undisputed that Withers and Hayes assaulted Sexton, and Wilson points to discrepancies in Defendant's statements regarding the incident. It is undisputed, however, the Defendant testified he observed from his seated position in the tower what appeared to be two inmates kicking the chain-link fence in the yard, and when he stood up he could see the two inmates standing shoulder-to-shoulder and kicking another inmate who was on the ground. Defendant then stepped out of the tower with his rifle and observed the altercation through his scope. With the aid of the scope he could see the victim against the fence on the ground being repeatedly kicked or stomped by the other two inmates. The victim appeared to be unconscious and was not defending himself. Defendant described the attack as "the most violent, vicious attack [he] had ever witnessed."

It is also undisputed that other staff shouted "stop fighting," but Withers and Hays continued their assault on Sexton. Finally, it is undisputed that the altercation was ongoing at the time Defendant shot Withers.

As noted, ODOC policy allows the use of lethal force to prevent imminent serious bodily injury or death or to prevent or

to stop a riot or other group disturbance by inmates when there
is reason to believe an inmate poses a threat of imminent serious
bodily injury or death to another person.  It is undisputed that
Defendant was familiar with these regulations.  ODOC reviewed
Defendant's conduct and determined the force used was in
compliance with ODOC's use-of-force policy, and all three yard
officers who witnessed the fight testified the force used by
Defendant was justified.  A Grand Jury also determined
Defendant's use of force was justified.

Of particular significance, it is undisputed that
Withers and another inmate were assaulting Sexton, he was on the
ground and was being kicked and/or stomped repeatedly, and he did
not appear to be defending himself.  Viewing all of the evidence
in the light most favorable to the Estate, the Court notes none
of the factual disputes on which the Estate relies create a jury
question as to whether Defendant acted "maliciously or
sadistically for the very purpose of causing harm" to Withers.
To the contrary, the Court concludes on this record that Wilson,
as Personal Representative of the Estate, has not shown that a
reasonable officer in Defendant's position could believe that
shooting an inmate who appeared to be causing serious bodily
injury to another who was on the ground and appeared to be
unconscious was not a good-faith effort to maintain and/or to
restore discipline.

Accordingly, the Court concludes there is not a genuine
dispute of material fact as to this issue, and, therefore,

Defendant is entitled to qualified immunity as to the First Claim asserted by Wilson as the Personal Representative of the Estate of Jayson Withers for use of excessive force in violation of Wither's Eighth Amendment rights.

### C. Wilson's Fourteenth Amendment Claim

Defendant also contends he is entitled to qualified immunity on the Second Claim in which Wilson asserts individually that Defendant violated Wilson's substantive due-process rights under the Fourteenth Amendment as Jayson Withers's mother. Here Defendant argues it is not clearly established that the "purpose-to-harm" standard on which Wilson relies applies to a substantive due-process claim in a prison-shooting case. Even if that standard was clearly established, Defendant maintains there is not any genuine dispute of material fact as to whether Defendant acted with a purpose to harm.

According to Wilson, however, Defendant's conduct in killing Withers was also "malicious" and "shocks the conscience." As a result, Wilson argues Defendant may be sued for his conduct that allegedly violated her Fourteenth Amendment rights as a parent.

### 1. The Law - Fourteenth Amendment

Parents may assert a Fourteenth Amendment substantive due-process claim if they are deprived of their liberty interest in the companionship and society of their child through official misconduct. *Lemire v. California Dep't of Corrections and Rehabilitation*, 726 F.3d 1062, 1075 (9th Cir. 2013). *See also*

*Zion v. Cty. of Orange*, 874 F.3d 1072, 1076–77 (9th Cir. 2017).
"[O]nly official conduct that 'shocks the conscience' is
cognizable as a due process violation." *Porter v. Osborn*, 546
F.3d 1131, 1137 (9th Cir 2008)(quoting *Cty. of Sacramento v.
Lewis*, 523 U.S. 833, 846 (1998)).

     Official conduct shocks the conscience if it occurs
with "deliberate indifference" or with a "purpose to harm . . .
unrelated to legitimate law-enforcement objectives." *Porter,* 546
F.3d at 1137. *See also Zion,* 874 F.3d at 1077 (citing *Porter,*
546 F.3d at 1133). The standard of deliberate indifference is
applicable "only when actual deliberation is practical." *Zion*,
874 F.3d at 1077. *See also Wilkinson v. Torres*, 610 F.3d 546,
554 (9th Cir. 2010); *Cty. of Sacramento v. Lewis*, 523 U.S. 883,
1719 (1998). "[I]n circumstances where an officer cannot
practically deliberate, such as where 'a law enforcement officer
makes a snap judgment because of an escalating situation, his
conduct may only be found to shock the conscience if he acts with
a purpose to harm unrelated to legitimate law enforcement
objectives.'" *A.D. v. California Highway Patrol*, 712 F.3d 446,
453 (9th Cir. 2013)(citing *Wilkinson v. Torres*, 610 F.3d 546, 554
(9th Cir. 2010)).

     The "purpose to harm" standard of culpability requires
proof of "the intent to inflict force beyond that which is
required by a legitimate law enforcement objective." *Porter*, 726
F.3d at 1140.

     Thus, an officer is entitled to qualified immunity in

the context of a Fourteenth Amendment claim when either
(1) the plaintiff has not alleged or shown facts that would
constitute a constitutional violation or (2) the plaintiff has
shown such a violation was not clearly established at the time of
the defendant's alleged misconduct. *Pearson v. Callahan*, 555
U.S. 223, 232 (2009).

### 2. Analysis

In *Lewis* the Court concluded a high-speed chase by
police that ended in the death of a motorcyclist did not meet the
shocks-the-conscience test because the police did not have the
intent to harm the motorcyclist. The Court noted a higher
standard of fault is required for officer liability when the
officer must make a decision "in haste, under pressure, and
frequently without the luxury of a second chance" such as during
prison riots. The Court stated:

> In those circumstances, liability should turn on
> "whether force was applied in a good faith effort
> to maintain or restore discipline or maliciously
> and sadistically for the very purpose of causing
> harm." (quoting *Whitley v. Albers*, 475 U.S. at
> 320-21).

*Lewis*, 523 U.S. at 853.

It is clearly established that a police officer who
acts under circumstances in which "actual deliberation is [not]
practical" violates an individual's Fourteenth Amendment due-
process rights if the officer acts with a "purpose to cause harm
unrelated to the legitimate object" of law-enforcement objectives
even if he acts in the defense of others. *A.D.*, 712 F.3d at 454.
*See also Moreland v. Las Vegas Metropolitan Police Dep't,* 159

20 – OPINION AND ORDER

F.3d 365, 372 (9th Cir. 1998).

　　　　For the same reasons the Court concluded Wilson's
Eighth Amendment claim cannot proceed, the Court concludes there
are not any plausible facts on this record that create a jury
questions as to whether Defendant acted with any purpose other
than to stop the assault on the victim or that the force applied
by Defendant was a good-faith effort to restore discipline.
Accordingly, the Court concludes as a matter of law that
Defendant is entitled to qualified immunity on Wilson's
Fourteenth Amendment claim.

**D.　　The Estate's State-Law Claims**

　　　　Finally, Wilson, on behalf of the Estate of Withers,
asserts claims under Oregon state law for battery and wrongful
death.　The Court acquired supplemental jurisdiction over these
claims based on the Court's original jurisdiction over the § 1983
claims.　*See* 28 U.S.C. § 1367.

　　　　Defendant contends he is entitled to summary judgment
on the state-law claims because Defendant was authorized to use
lethal force to prevent the assault on the victim.　Defendant
contends it is undisputed that he shot Withers while Withers was
committing a violent assault on Sexton and that Defendant's
action was taken to prevent that harm.　In addition, Defendant
asserts there is not any evidence that he had the intent to
violate Withers's rights.　In the alternative, Defendant argues
if the Court dismisses the federal claims, the Court no longer
has supplemental jurisdiction as to the state-law claims, and,

therefore, the Court should dismiss those state-law claims for lack of jurisdiction.

Wilson's only response to Defendant's arguments is that "all of the facts are not evolved or developed enough at this stage to make any determination whether [Defendant] acted negligently or whether he is even entitled to any defenses."

### A.  Standard

Oregon courts have defined "battery" as an intentional tort that "is a 'voluntary act that is intended to cause the resulting harmful or offensive contact.'" *Ballard v. City of Albany*, 221 Or. App. 630, 640–41 (2008)(quoting *Walthers v. Gossett*, 148 Or. App. 548, 552 (1997)).  The Oregon Court of Appeals has held when the "physical violence exerted by the officers against [the] plaintiff was no more than necessary to accomplish the legitimate purpose of fulfilling their duty," the force was reasonable and the officers did not commit assault or battery. *Gigler v. City of Klamath Falls*, 21 Or. App. 753, 763 (1975). *See also Evans v. Multnomah Cty.,* No. 07-CV-1532-BR, 2009 WL 1011580, at *8 (D. Or. Apr. 15, 2009), *aff'd in part, rev'd in part and remanded*, 492 F. App'x 756 (9th Cir. 2012).

### B.  Analysis

As noted, it is undisputed that Withers was assaulting Sexton, that Sexton was on the ground and appeared to be unconscious, and, despite warnings from other officers to stop, Withers continued to kick and/or to stomp Sexton.

Although ODOC regulations authorize the use of lethal force to prevent injury to another, the Estate's state-law claims only require a showing that the physical force Defendant used in shooting Withers was "more than necessary to accomplish the legitimate purpose of fulfilling [his] duty."

Applying this standard to the evidence viewed in the light most favorable to the Estate, the Court concludes on this record that there are genuine disputes of material fact as to whether the physical force Defendant used was "more than necessary to accomplish the legitimate purpose of fulfilling" his duty. Accordingly, the Court denies Defendant's Motion for Summary Judgment as to the Estate's state-law claims.

## II.  Motions to Strike

Wilson moves to strike the testimony of Eugene Atherton and Rod Englert that Defendant submitted in support of Defendant's Motion for Summary Judgment.

Defendant, in turn, moves to strike portions of the testimony by Jeremy Bauer that Wilson submitted in opposition to Defendant's Motion for Summary Judgment.  Each side contends the evidence submitted by the other is inadmissable under the standards set out in *Daubert v. Merrell Down Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

The Court, however, did not find it necessary to consider these Declarations in resolving Defendant's Motion for Summary Judgment, accordingly, the Court denies as moot each parties' respective Motion to Strike these Declarations.

**III. Supplemental Jurisdiction Over the Estate's State-Law Claims**

As noted, Defendant contends in the event the Court dismisses the federal claims, the Court should decline to continue to exercise supplemental jurisdiction over the state-law claims for battery and wrongful death. In her response Wilson does not directly address this issue.

**A.    Standard**

The exercise of supplemental jurisdiction over the remaining state-law claims is committed to the discretion of the district court. *See Foster v. Wilson*, 504 F.3d 1046, 1051-52 (9th Cir. 2007)("The decision whether to continue to exercise supplemental jurisdiction over state law claims after all federal claims have been dismissed lies within the district court's discretion.")(citing 28 U.S.C. § 1367(c)(3); *Fang v. United States,* 140 F.3d 1238, 1243-44 (9th Cir. 1998)).

The Ninth Circuit has held district courts generally should decline to exercise supplemental jurisdiction over state-law claims after the federal claims have been dismissed before trial. *See, e.g.*, *Schultz v. Sundberg*, 759 F.2d 714, 718 (9th Cir. 1985)("Generally, dismissal of federal claims before trial dictates that the pendent state claims should also be dismissed."); *Souch v. Howard*, 27 F. App'x 793, 795 (9th Cir. 2001)("When all federal claims have been dismissed before trial, the interests promoted by supplemental jurisdiction are no longer present, and a court should decline to exercise jurisdiction over state-law claims.").

In *Souch v. Howard* the plaintiff-inmate brought a

§ 1983 action alleging the defendants violated his Eighth

Amendment rights by failing to treat his medical condition. He

also brought a state-law claim against the defendants for

improperly charging him for his medical visits under a statute

enacted after he was incarcerated. The district court granted

summary judgment in favor of the defendants on the federal claim.

The district court, however, held it still had jurisdiction over

the state-law claim in spite of its dismissal of the federal

claim, and then the district court found in favor of the

plaintiff on the state-law claim. In deciding the appeal of the

judgment in the plaintiff's favor on the state-law claim, the

Ninth Circuit concluded the district court abused its discretion

by exercising jurisdiction over the state-law claim after it had

dismissed the federal claim, noting the state-law claim was

unrelated to the federal claim.

> Federal courts have supplemental jurisdiction to
> consider state-law claims when they are "so related" to
> the federal claims that they "form part of the same
> case or controversy." 28 U.S.C. § 1367(a). The
> exercise of supplemental jurisdiction is designed to
> promote "judicial economy, convenience, fairness, and
> comity." *Carnegie-Mellon University v. Cohill*, 484
> U.S. 343, 350 n. 7 (1988). When all federal claims
> have been dismissed before trial, the interests
> promoted by supplemental jurisdiction are no longer
> present, and a court should decline to exercise
> jurisdiction over state-law claims. 28 U.S.C.
> § 1367(c); *Carnegie-Mellon*, 484 U.S. at 350 n.7.

*Souch v. Howard*, 27 F. App'x 793, 794-95 (9th Cir. 2001).

As noted, the Court has not had the benefit of Wilson's

analysis of this jurisdictional question. Accordingly, and in

light of *Schultz* and *Souch,* the Court **DIRECTS** the parties to file simultaneous, supplemental briefs (not to exceed five pages) no later than February 16, 2018, addressing (1) whether the Court should exercise its discretion to retain supplemental jurisdiction and to resolve the state-law claims or whether it should decline to do so and (2) whether the fact that only state-law claims remain will affect the parties' recent statements as to the timing of their availability for trial or the place of trial.

**CONCLUSION**

For these reasons the Court **GRANTS in part** and **DENIES in part** Defendant's Motion (#47) for Summary Judgment.  The Court **GRANTS** Defendant's Motion as to the federal claims alleged in Claims One and Two and **DISMISSES** those claims **with prejudice**. The Court **DENIES** Defendant's Motion as to the Estate's state-law claims as alleged in Claims Three and Four.

The Court **DIRECTS** the parties to file **no later than February 16, 2018**, simultaneous, supplemental briefs (not to exceed five pages) addressing whether (1) the Court should exercise its discretion to retain supplemental jurisdiction over the state-law claims or whether it should decline to do so and (2) whether the fact that only state-law claims remain will affect the parties' recent statements as to the timing of their availability for trial or the place of trial.

The Court also **DENIES as moot** Defendant's Motion (#67) to

Strike and Wilson's Motion (#57) to Strike.

IT IS SO ORDERED.

DATED this 2nd day of February, 2018.

/s/ Anna J. Brown
_____
ANNA J. BROWN
United States Senior District Judge